IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

RABIDEAU KLEIN, P.A.,

Plaintiff, Case No.:

v.

FIRST HORIZON BANK, **JURY TRIAL DEMANDED**

Defendant.
_______________________________/

NOT A CERTIFIED COPY

## COMPLAINT

Plaintiff, RABIDEAU KLEIN, P.A. ("RKPA"), through its undersigned counsel, hereby sues FIRST HORIZON BANK ("Defendant") and states as follows.

## INTRODUCTORY STATEMENT

1. This is an action for damages by RKPA, a Florida law firm, against its bank, Defendant, relating to Defendant's failures in the administration and oversight of RKPA's attorney trust bank account ending -4009 (the "RKPA Bank Account") that resulted in a bad actor sending thirteen unauthorized wire transfers totaling $17,276,700 in the early hours of January 29, 2026 (the "Fraudulent Wire Transfers").

2. Defendant failed to act and prevent the Fraudulent Wire Transfers by ignoring numerous and glaring red flags that should have alerted even minimally attentive bank personnel to the fact that the RKPA Bank Account was under malicious attack. For example, the bad actor gained unauthorized access to the RKPA Bank Account through Defendant's online banking platform and, among other things, changed multiple RKPA user passwords, created a new User ID associated with the RKPA Bank Account, disabled multiple other RKPA user accounts, and called Defendant's customer service center to request a new RSA token for purposes of sending the

EXHIBIT
1

fraudulent wire transfers, which Defendant's customer service team provided. Within hours of these actions, and also within Defendant's online banking platform, the bad actor initiated the Fraudulent Wire Transfers and Defendant executed them.

3. Defendant's actions and omissions led to this event. Its security failures exposed RKPA to targeting, its personnel provided critical credentials that enabled bad actors to take over the RKPA Bank Account, and it ignored and disregarded a cascade of red flags and alarm bells that followed and clearly signaled fraudulent activity was occurring. In essence, Defendant put a bullseye on RKPA, handed bad actors a bow with arrows, and then watched as the arrows struck RKPA in rapid succession without taking any action to stop the attack.

4. But because RKPA reacted quickly and notified law enforcement, approximately $10,729,929.79 has been recovered and returned to RKPA to date, but approximately $6,546,770.21 remains outstanding that Defendant must refund to RKPA, with interest.

5. RKPA demanded that Defendant make it whole and Defendant has refused.

6. Defendant's failed security protocols and procedures here, and in a series of other recent security lapses, confirm that Defendant does not protect customer information or offer secure wire transfer services to its customers.

7. Defendant's failures have caused catastrophic financial and operational harm to RKPA because the RKPA Bank Account was holding escrowed funds for RKPA's clients and others associated with real estate transactions.

8. The subsequent fallout from these events has caused considerable and potentially irreparable damage to RKPA, which Defendant has refused to acknowledge. Defendant further refuses to indemnify RKPA for increasing litigation costs and expenses incurred (and that will continue to be incurred) because of the Fraudulent Wire Transfers.

NOT A CERTIFIED COPY

9. RKPA was left with no choice but to commence this action and obtain recovery of damages that Defendant's actions have caused RKPA.

## PARTIES, JURISDICTION, AND VENUE

10. The amount in controversy exceeds $50,000, exclusive of interest, costs, and attorney's fees.

11. RKPA is a corporation organized pursuant to the laws of Florida, with its principal place of business in Palm Beach County, Florida.

12. Defendant is a state-chartered bank and member of the Federal Reserve System organized pursuant to the laws of Tennessee, with its principal place of business in Tennessee, which is authorized to transact banking business in Florida.

13. Venue is proper in this Court because the Defendant conducts business in Palm Beach County, Florida, RKPA's principal place of business is located in Palm Beach County, Florida, and a substantial part of the events and omissions giving rise to this action occurred in Palm Beach County, Florida.

## FACTUAL BACKGROUND

### *a. The RKPA Bank Account and RKPA's Use of Wire Transfers Generally*

14. The RKPA Bank Account was opened decades ago at a Lydian Private Bank branch located at 180 Royal Palm Way, Palm Beach, Florida, which is close to RKPA's office.

15. The RKPA Bank Account was always used as an attorney trust account for RKPA in the operation of its law practice and to conduct real estate transactions.

16. Following several bank mergers, Iberiabank administered and oversaw the RKPA Bank Account until Iberiabank merged with Defendant in or about July 2020.

NOT A CERTIFIED COPY

17. Upon information and belief, through that merger, Defendant acquired Iberiabank's physical branch location at 180 Royal Palm Way in addition to numerous other bank branches throughout the State of Florida and other southeastern states. As of 2025, Defendant was the 37th largest insured depository in the United States controlling approximately $81 billion in total assets.

18. During the time the RKPA Bank Account was administered and overseen by Iberiabank and its predecessors, RKPA experienced no difficulties and conducted countless transactions related to its law practice, including sending wire transfers.

19. Following the merger, the RKPA Bank Account and RKPA's banking relationship was transferred to Defendant, and RKPA continued to operate its law practice and send wire transfers using Defendant's online banking platform.

20. RKPA had multiple users who could access Defendant's online banking platform to add or create wire transfers for RKPA, but only Guy Rabideau, David Klein, and Melissa Chapter could authorize those wire transfers using an RSA token code prior to Defendant's execution of wire transfers.

21. The process used by RKPA included an RKPA user, other than Guy Rabideau and David Klein, adding/creating a wire transfer in Defendant's online banking platform and then only a user with the ability to authorize wires, typically Guy Rabideau or David Klein, would log onto Defendant's online platform from their computer (not their mobile phone) and enter the RSA token code to approve the wire transfer added/created by the other RKPA user.

22. At no time prior to the Fraudulent Wire Transfers did Guy Rabideau, David Klein, or Melissa Chapter ever add/create a wire transfer in Defendant's online banking platform and then authorize that same wire transfer using their RSA token.

NOT A CERTIFIED COPY

23. Also at no point in time did RKPA send an international wire transfer to China from the RKPA Bank Account prior to the Fraudulent Wire Transfers.

24. Also at no point in time did RKPA send an international wire transfer to Mexico from the RKPA Bank Account prior to the Fraudulent Wire Transfers.

***b. Defendant's Wire Transfer Service and Relevant Documentation***

25. Defendant offers its customers the ability to send wire transfers using Defendant's online banking platform, but its website and documentation indicate that a customer must enroll in that service before it can send wire transfers.

26. For example, Defendant's website says "[o]nce enrolled, wires can be initiated via phone, online, or as batches of multiple wires sent in the same file."[1]

27. In addition, years after the Iberiabank merger, on or about April 18, 2023, RKPA (at the time organized and known as "Rabideau Law P.A.") executed Defendant's Treasury Management Services Authorization and Consent form (the "Services Authorization"). A copy of the executed Services Authorization is attached as **Exhibit 1**.

28. The Services Authorization states that a customer must enroll in a service and get approved by Defendant before using such service. More specifically, the Services Authorization states that "[c]lient may from time to time request Bank to provide any Services described in the Treasury Management Services Master Agreement (the 'TM Service Agreement') by enrolling in any such Service through the Enrollment Form. Client may begin to use any such Service once Bank has approved such use and has received all required and properly executed forms and Client has successfully completed any implementation requirements."

NOT A CERTIFIED COPY

---

1 https://www.firsthorizon.com/Small-Business/Products-and-Services/Cash-Management/Cash-Flow-Solutions/Wire-Transfer-Services (last visited June 10, 2026).

29. RKPA also executed on or about April 18, 2023 a Treasury Management Product Enrollment Form (the "Enrollment Form"). A copy of the executed Enrollment Form is attached as **Exhibit 2**.

30. The Enrollment Form "details the Treasury Management services to be provided by Bank and is required to be updated as changes to these services are requested."

31. In the Enrollment Form section titled "Select Applicable Services," the only service selected by RKPA is Positive Pay, which is not a wire transfer service. No other services are selected, including Defendant's Treasury Connect, Wire Transfer, or International Wire Transfer service options, all of which are left unselected.

32. On the last page of the Enrollment Form, in the section titled "Dual Approval Opt Out," User Management, Transactions – ACH, and Transactions – Wire selections are checked. Notwithstanding that these selections were checked, Defendant did not properly or fully enroll RKPA in Defendant's wire transfer service as required by the Services Authorization, which requires a signed Enrollment Form indicating the services a customer is enrolled in.

33. Subsequent to RKPA's execution of the Services Authorization and Enrollment Form, RKPA continued to operate its law practice and send wire transfers as it previously did, using Defendant's online banking platform.

***c. Defendant Proclaims its Customer Information is Protected, that it Provides Secure Services, and that its Security Practices are in-line with Federal Law***

34. Defendant's website touts the security of its wire transfer service stating that it "offers multiple layers of security as well as configurable user permissions and transfer limits."[2]

NOT A CERTIFIED COPY

---

[2] https://www.firsthorizon.com/Small-Business/Products-and-Services/Cash-Management/Cash-Flow-Solutions/Wire-Transfer-Services (last visited June 10, 2026)

35. Defendant's website further says that "[i]f your business initiates wires inside the U.S. only, you can easily prevent foreign hackers from fraudulently originating wires and sending your funds overseas. Our International Wire Block automatically rejects all international wire transfers on your account regardless of the source (online, telephone, or via the financial center). All attempts are blocked and reported to you. There's nothing more you have to do."[3]

36. Defendant also claims online that its "[f]irewalls monitor all data traffic to and from First Horizon Bank, ensuring that only known users are able to gain access" to its online banking platform.[4]

37. Defendant's website further says that fraud prevention is a shared responsibility between Defendant and its customers, and that its employees recognize customer voices and watch patterns of business activity to prevent fraud. More specifically, Defendant published an article on its website titled "Vigilance Against Fraud on Company Bank Accounts Calls for Teamwork," where Defendant claims it prevented millions of dollars in fraudulent wire transfers when its employees took action after a suspicious sounding caller attempted a transaction that did not "match the customer's usual pattern of business."[5] A screenshot from this article is below.


***"Knowing the customer – their voice, their name, what they do, and what they don't do – helped save them $2 million."***

– Eddie Buttross

Vice President of Commercial Banking at First Horizon

NOT A CERTIFIED COPY

---

3 https://www.firsthorizon.com/Small-Business/Products-and-Services/Cash-Management/Cash-Flow-Solutions/Wire-Transfer-Services (last visited June 10, 2026).

4 https://www.firsthorizon.com/Corporate/Support-Corporate/BusinessConnect-and-TreasuryConnect-Help/BusinessConnect-and-TreasuryConnect-FAQs (last visited June 10, 2026).

5 https://www.firsthorizon.com/fightfraud (last visited June 10, 2026).

38. Defendant's Privacy Policy says to "protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[6]

39. Defendant's website has a section titled "Corporate Statements" where it claims it works diligently to verify customer identities and has a policy to "ensure compliance with related regulations through its BSA/AML/OFAC Compliance Program." This same webpage claims Defendant is committed to safeguarding and protecting customer and financial data, and that its "business practices, processes and controls regarding the protection and privacy of client data are subject to numerous federal regulations, including the Gramm-Leach-Bliley Act . . . ."[7]

***d. Defendant's Proclamations of a Commitment to Security is at Odds with its Recent Security failures and Substandard Security Tools***

40. Despite Defendant's public claims of providing secure banking services and keeping a keen eye out for unusual patterns of activity or bad actors impersonating its customers, Defendant's recent security failures confirm otherwise.

41. In or about April 2021, Defendant's parent company filed a Form 8-K with the SEC stating that "an unauthorized third party had obtained login credentials from an unknown source and attempted access to customer accounts. Using the credentials and exploiting a vulnerability in third-party security software, the unauthorized party gained unauthorized access to under 200 on-

NOT A CERTIFIED COPY

6 https://www.firsthorizon.com/First-Horizon-Corporation/Privacy-Policy (last visited June 10, 2026).

7 https://www.firsthorizon.com/First-Horizon-Corporation/Corporate-Responsibility/Corporate-Statements (last visited June 10, 2026).

line bank accounts, had access to personal information in those accounts, and fraudulently obtained an aggregate of less than $1 million from some of those accounts."[8]

42. In September 2025, the Board of Governors of the Federal Reserve System issued an Order of Prohibition regarding a former employee of Defendant who "used his position as a wire transfer administrator . . . to obtain confidential customer information, which he then provided to a third party . . . who utilized the information . . . to impersonate customers and initiate fraudulent wire transfers from those customers' accounts."[9]

43. In or about early February 2026, one of Defendant's employees emailed a spreadsheet containing Defendant's confidential customer information to another Florida attorney. According to this Florida attorney, the spreadsheet contained approximately 4,000 rows of confidential customer information, including, among other things, Defendant's customers' names, User ID's, account numbers, account balances, and the number of wire transfers sent by each of the customers. RKPA was informed by this Florida attorney that RKPA was listed on the spreadsheet, and that Defendant was aware it had sent it to him. Further, RKPA was informed by this Florida attorney that Debra Vasilopoulos, Defendant's Market President for Palm Beach and Broward Counties, told him that Defendant never had a security breach, despite the other incidents referenced above. To date, Defendant has failed to notify RKPA of this unauthorized disclosure of RKPA's confidential information, nor is RKPA aware that Defendant has notified any of the other customers who were affected by this unauthorized disclosure of their confidential information.

NOT A CERTIFIED COPY

---

8 https://www.sec.gov/Archives/edgar/data/36966/000093041321000908/c101637_8kixbrl.htm (last visited June 10, 2026).

9 https://www.federalreserve.gov/newsevents/pressreleases/files/enf20250918a1.pdf (last visited June 10, 2026).

44. RKPA has also learned that around the same time as the Fraudulent Wire Transfers, other customers of Defendant were targeted by bad actors posing as employees of Defendant. These other customers were targeted and contacted by bad actors who knew the customers' online banking credentials and were attempting to use that confidential information to convince the customers they were bank personnel who needed to obtain RSA token codes from the customers. Upon information and belief, at least one of these customers fell victim to the bad actors' scheme and fraudulent wire transfers were executed by Defendant.

45. Although Defendant publicly claims it provides secure banking services and is committed to protecting its customer and financial data, its online banking platform does not require multifactor authentication, which is inconsistent with federal guidelines.

46. For example, Defendant's "Forgot User ID or Password" reset process requires only access to an email, telephone number, or text message where a code is sent by Defendant. Anyone with access to that code can use it to both obtain the User ID and reset the password for the online banking account without Defendant obtaining further identifying information. That is not multifactor authentication.

47. Defendant even has an online tutorial (visible to world, including bad actors) that walks through how this process works.[10] Below are screenshots from relevant steps in the tutorial.

NOT A CERTIFIED COPY

---

[10] https://www.firsthorizon.com/Small-Business/Products-and-Services/Digital-Banking-Services/Bill-Pay/Forgot-User-ID-or-Password-Demo (last visited June 10, 2026).




NOT A CERTIFIED COPY

48. As these screenshots show, as long as someone has access to the email, text, or telephone line where the code is sent, Defendant's online banking platform will visibly display the bank account's User ID and allow the password to be changed without further identifying information.

49. Upon information and belief, Defendant's security failures and substandard security tools led to RKPA being targeted by a bad actor which ultimately led to the Fraudulent Wire Transfers.

***e. The Targeted Attack of Defendant's Online Banking Platform and RKPA Email and Telephone Service***

50. RKPA was the victim of a targeted attack by an unknown third-party threat actor (the "Threat Actor") whose actions suggest it targeted RKPA and knew how to exploit vulnerabilities within Defendant's online banking platform, customer service center, and wire transfer service.

51. More specifically, on or about January 27, 2026, RKPA received an email from a known email address that included a falsified SharePoint link to documents. This appears to have allowed the Threat Actor to gain unauthorized access to one of RKPA's Microsoft 365 email accounts. No network or device access occurred.

52. On or about January 28, 2026, the Threat Actor placed suspicious sounding calls to both Sangoma US Inc. ("Sangoma"), RKPA's VoIP service provider, and to Defendant. In both calls, the Threat Actor—who sounds nothing like Guy Rabideau—impersonated Guy Rabideau when dealing with employees of Sangoma and Defendant.[11]

53. In the call to Sangoma on January 28, 2026, the Threat Actor, without providing any nonpublic information for verification, convinced Sangoma to forward RKPA telephone lines to his telephone number.

54. The Threat Actor also called Defendant in the evening hours of January 28, 2026. According to a summary of events provided by Defendant to RKPA, immediately prior to the

[11] Prior to the commencement of this lawsuit, RKPA received copies of the recorded calls the Threat Actor placed to Sangoma and Defendant.



NOT A CERTIFIED COPY

Threat Actor's telephone call to Defendant the Threat Actor used Defendant's online banking self-service password reset flow to reset the password for Guy Rabideau's account. During this password reset process, Defendant provided the Threat Actor with Guy Rabideau's User ID. Upon information and belief, the Threat Actor used Defendant's Forgot User ID or Password reset process outlined above in paragraphs 46-47.

55. Within minutes of that password reset, the Threat Actor called Defendant from a telephone number not associated with RKPA. The Threat Actor said he was Guy Rabideau and claimed he had a new iPhone and needed Defendant to reissue an RSA token. Defendant's employee asked for an "account number or card number." The Threat Actor hesitated and then said "okay, uh, **their** account number, um, one moment, that would be . . ." and he gave the account number for the RKPA Bank Account (which is basic information that can be found on any check). Critically, Defendant's employee did not inquire why the Threat Actor referred to the account number as "their account number." Instead, she simply moved forward with the call.

56. Defendant's employee then asked for "the full business name," to which the Threat Actor responded "Rabideau Klein." Upon information and belief, this is not the name Defendant has in its system for RKPA. Certain records recently provided by Defendant identify "Rabideau Law P.A." as the business name in Defendant's system. For example, a copy of a wire transfer notification recently provided by Defendant shows that its system still lists RKPA as "Rabideau Law P.A."

NOT A CERTIFIED COPY

| CREDIT PARTY | | DEBIT PARTY | |
|---|---|---|---|
| ACCOUNT NUMBER: | [redacted]4302/ | ACCOUNT NUMBER: | [redacted]4009/ |
| NAME: | WELLS FARGO INTL USD | NAME: | RABIDEAU LAW P A |
| ADDRESS: | NEW YORK<br>NEW YORK | ADDRESS: | 440 ROYAL PALM WAY STE 101<br>PALM BEACH FL 33480 US |
| ORDERING PARTY | | SENDING PARTY | |
| ORDERING CUSTOMER ACCOUNT: | [redacted] | SENDER NAME: | |
| ORDERING CUSTOMER: | RABIDEAU LAW P A | SENDER BANK: | |
| ORDERING CUSTOMER ADDRESS: | 440 ROYAL PALM WAY SUITE 101<br>Palm Beach,FL 33480 38103 | SENDER BANK ADDRESS: | |
| | | SENDER REFERENCE #: | [redacted]0571 |

57. Notwithstanding this discrepancy in the business name provided by the Threat Actor, Defendant's employee again simply moved forward with the call without addressing it. She asked the Threat Actor for the last four digits of Guy Rabideau's social security number and the User ID for his online banking account. The Threat Actor was able to provide this information, having just been provided with Guy Rabideau's User ID by Defendant during the password reset process.

58. The Threat Actor was then transferred to Defendant's Treasury Management department and spoke with a different employee to obtain a new RSA token.

59. The Treasury Management employee asked the Threat Actor for four pieces of information: User ID, full name, email address, and last four digits of account number. These identifying questions, outside of the User ID which Defendant itself had already provided to the Threat Actor, fail to sufficiently identify a caller because account numbers are commonly found on checks which are available to others, and names and email addresses are publicly available.

60. The Treasury Management employee then said she would text a verification code to RKPA's phone number, but the Threat Actor insisted on it being sent via telephone call. Without clarifying why a different delivery method was being requested, Defendant's employee sent it by telephone call.

NOT A CERTIFIED COPY

61. After the Threat Actor read the code back, Defendant's employee emailed an RSA token activation link and provided instructions to the Threat Actor on how to set up the new RSA token. Upon information and belief, the Threat Actor followed those instructions and registered the new RSA token after intercepting and hiding the email from RKPA.

62. After obtaining this unauthorized access to Defendant's online banking platform, and over the course of the next several hours into the early morning hours of January 29, the Threat Actor took a number of actions inside Defendant's online banking platform that showed the RKPA Bank Account was under malicious attack (the "Indicators of Fraud"). More specifically, the Indicators of Fraud, which were tracked and captured by Defendant's online banking platform log data included, among other things:

i. Resetting the password to Guy Rabideau's account;

ii. Numerous log ins to Guy Rabideau's account from multiple IP addresses not associated with RKPA that geolocated to Chicago, Illinois;

iii. Modifying Guy Rabideau's account settings, changing "Mobile User" from No to Yes;

iv. Resetting the password to David Klein's account;

v. Log in to David Klein's account from an IP address not associated with RKPA that geolocated to Chicago, Illinois;

vi. Attempting user maintenance inside David Klein's account with failed access to RSA token;

vii. Creating a second and new User ID for Guy Rabideau with a new email address and telephone number that belonged to the Threat Actor, not RKPA (rklann@inpipeenargy.com and 407-999-2436);

NOT A CERTIFIED COPY

viii. Disabling online bank account access of four (4) other RKPA users;

ix. The password resets and user disabling actions changed the account access for every RKPA user to Defendant's online banking platform, and this occurred overnight within a matter of hours;

x. All account changes were made after normal business hours, and RKPA has never made account changes after normal business hours;

xi. Creating and approving fourteen (14)[12] wire transfers to parties with whom RKPA has not previously conducted business;

xii. Both creating and approving wire transfers using the same RKPA user account (which is inconsistent with RKPA's known practice);

xiii. Initiating fourteen (14) fraudulent wire transfers all in round numbers;

xiv. Sending wire transfers to China when RKPA has never before sent wire transfers to China from the RKPA Bank Account;

xv. Sending wire transfers to Mexico when RKPA has never before sent wire transfers to Mexico from the RKPA Bank Account; and

xvi. Most of the Fraudulent Wire Transfers were initiated prior to normal business hours, beginning earlier than 7:00 A.M. EST, and RKPA has never initiated wire transfers earlier than normal business hours.

NOT A CERTIFIED COPY

[12] The Threat Actor created and approved fourteen wire transfers in total, one of which was blocked by Defendant.

### *f. The Fraudulent Wire Transfers*

63. Notwithstanding the numerous Indicators of Fraud, Defendant executed and released thirteen of the fourteen wire transfers that the Threat Actor initiated in Defendant's online banking platform. All fourteen fraudulent wire transfers initiated by the Threat Actor are:

i. $850,000 international wire to Om Construccion E SA DE CV;

ii. $550,000 international wire to Shaoxing Fanshun Import and Export Co Ltd.;

iii. $4,774,700 international wire to Shaoxing Fanshun Import and Export Co. Ltd.;

iv. $947,000 international wire to Tanktom Industries LLC;

v. $4,500,000 international wire to Jining Nachen Trading Co. Ltd.;

vi. $980,000 domestic wire to April Briggs LLC;

vii. $750,000 domestic wire to Tanktom Industries LLC;

viii. $950,000 domestic wire to Watmade LLC;

ix. $1,500,000 international wire to NBGD Holdings SA DE CV;

x. $600,000 domestic wire to Hazeell LLC;

xi. $505,000 domestic wire to Brash & Sassy Limited;

xii. $170,000 domestic wire to Martin R. Kidder;

xiii. $200,000 domestic wire to Workvision Studio; and

xiv. $300,000 international wire to Cystal Heating & Cooling Services Inc.

64. Defendant claims it blocked prior to release the $300,000 wire transfer to Crystal Heating & Cooling Services Inc. but has not explained why or how it blocked that wire while it

NOT A CERTIFIED COPY

executed and released the Fraudulent Wire Transfers (i.e., the thirteen other wire transfers listed in paragraph 63 above).

65. Each of the Indicators of Fraud standing alone, but certainly in the aggregate, should have alerted Defendant that fraudulent activity was afoot, and that it needed to further investigate, prevent, and block the Fraudulent Wire Transfers. Indeed, by the time the Fraudulent Wire Transfers were initiated, Defendant was not observing a single suspicious event. It was watching a barrage of arrows (which it handed to the Threat Actor) strike RKPA in the form of password resets, user-account modifications, creation of new credentials, disabling of legitimate users, wires to foreign destinations, unusual timing and unprecedented transaction patterns, among other things, that all pointed in the same direction—the RKPA Bank Account was under malicious attack. But instead of exercising reasonable care and blocking the Fraudulent Wire Transfers, Defendant executed them.

66. Defendant is required to follow the mandates of a Customer Identification Program and the Bank Secrecy Act to verify a sender's identity before initiating a wire transfer, and it is responsible for ongoing fraud monitoring with an obligation to act upon the Red Flag Rules with procedures in place to detect, prevent, and mitigate identity theft. Upon information and belief, Defendant either has no such procedures in place, its procedures are substandard, or it failed to adhere to them.

67. Had Defendant fulfilled its basic legal and contractual obligations, employed and followed commercially reasonable security procedures in good faith, and properly responded to and investigated the Indicators of Fraud and other red flags as a reasonably prudent bank is required to do, the Fraudulent Wire Transfers would not have been released and executed by Defendant.

NOT A CERTIFIED COPY

***g. RKPA's Discovery of the Fraudulent Wire Transfers, Costs and Expenses Incurred, and its Efforts to Recover Funds from Defendant***

68. At approximately 10:00 a.m. on January 29, no RKPA employee could log into Defendant's online banking platform. Numerous RKPA employees tried logging in, but their access to the RKPA Bank Account was all denied.

69. An RKPA employee immediately called Defendant and was told by one of Defendant's employees that Defendant flagged the RKPA Bank Account for fraudulent activity, so RKPA employees immediately went to the physical bank branch nearby RKPA's office to speak further with Defendant's employees.

70. Upon information and belief, following Defendant's flagging of the RKPA Bank Account for fraudulent activity, Defendant continued to execute and release certain of the Fraudulent Wire Transfers.

71. Local and federal law enforcement agencies were also immediately contacted by RKPA, and they responded and are investigating this matter.

72. To date, approximately $10,729,929.79 of the Fraudulent Wire Transfers has been recovered and refunded to RKPA (the "Refunded Amount"), but Defendant has refused to return and refund the outstanding amount, which is approximately $6,546,770.21 (the "Outstanding Amount").

73. As a result of the Fraudulent Wire Transfers, and in addition to the Outstanding Amount, RKPA has suffered damages including, but not limited to, costs and expenses to retain counsel to initiate litigation to recover funds from the banks and bad actors who received the Fraudulent Wire Transfers (*see* Palm Beach County Circuit Court Case No. 26-CA-1881), costs and expenses to retain separate counsel to assist RKPA with its reporting obligations under the Rules Regulating the Florida Bar, and costs and expenses to retain undersigned counsel in relation

NOT A CERTIFIED COPY

to this litigation and to defend RKPA in litigation related to the Outstanding Amount initiated by third parties whose funds were being held in escrow in the RKPA Bank Account.

74. RKPA has also incurred and suffered other damages including, but not limited to, lost revenues, business interruption, reputational damage, and other consequential and incidental damages to be determined with further precision in the future and presented to the trier of fact.

75. RKPA has attempted in good faith to resolve this matter with Defendant, but Defendant has refused to reimburse RKPA the Outstanding Amount or otherwise compensate RKPA for its damages.

76. Following execution of the Fraudulent Wire Transfers, Defendant sent RKPA copies of account agreements that Defendant claims pertain to the RKPA Bank Account. More specifically, Defendant sent RKPA a Digital Banking Agreement ("DBA"), a Treasury Management Services Master Agreement ("TMSMA"), and a document that outlines certain "Terms and Conditions" that Defendant called a Depositor Agreement ("Depositor Agreement"). None of these documents are signed by RKPA, and RKPA does not admit that these are the operative agreements that pertain to or govern the RKPA Bank Account or the Fraudulent Wire Transfers, nor that they would even be binding agreements showing mutual assent or consideration to each party. As indicated above in paragraphs 27 and 29, RKPA has signed only the Services Authorization and Enrollment Form.

77. All conditions precedent, if any, to the initiation and maintenance of this action have occurred or were waived.

**COUNT I: Violation of Florida Statutes Chapter 670**

78. RKPA realleges and incorporates paragraphs 1 through 77 above as if fully set forth herein.

NOT A CERTIFIED COPY

79. The initiation of the Fraudulent Wire Transfers in Defendant's online banking platform were payment orders, and Defendant was the receiving bank with respect to those payment orders, as those terms are defined in Florida Statutes § 670.103.

80. Under Florida Statutes § 670.202(2), if a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if the security procedure is a commercially reasonable method of providing security against unauthorized payment orders and the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer.

81. Under Florida Statutes § 670.201 a security procedure means a procedure established by agreement between a customer and a receiving bank for the purpose of (i) verifying that a payment order or communication amending or canceling a payment order is that of the customer, or (ii) detecting error in the transmission or the content of the payment order or communication.

82. Good faith under Florida Statutes § 670.105(1)(f) means honesty in fact and the observance of reasonable commercial standards of fair dealing.

83. Under Florida Statutes § 670.204, if a bank accepts a payment order that is not authorized and not effective as the order of the customer under Florida Statutes § 670.202 or is unenforceable, in whole or in part, under § 670.203, the bank must refund any payment of the payment order received from the customer with interest on the refundable amount from the date of payment to the date of refund.

NOT A CERTIFIED COPY

84. Because Defendant did not properly and fully enroll RKPA in Defendant's wire transfer service as required in the Services Authorization and Enrollment Form signed by RKPA, there was no agreed upon security procedure that Defendant can claim compliance with for the authentication of the payment orders associated with the Fraudulent Wire Transfers.

85. Alternatively, even if RKPA was properly and fully enrolled in Defendant's wire transfer service, which RKPA denies, there was no agreed upon security procedure that Defendant can claim compliance with for the authentication of the payment orders associated with the Fraudulent Wire Transfers.

86. More specifically, the TMSMA does not contain the requisite agreement that describes the precise actions Defendant must take to verify and authenticate payment orders. Instead, the TMSMA (Section 6.1 of the General Terms and Conditions) generically defines "Security Procedures" by stating that "Bank and Client have established certain processes or procedures for the purposes of verifying that communications, orders, instructions, or inquiries regarding a Service transaction or other Service activity are those of Client, and/or for the purpose of authenticating Client or its Authorized Users . . . in connection with Client's use of the Services (the 'Security Procedures')." This definition of "Security Procedure" in the TMSMA does not meet the requirements of Florida Statutes Chapter 670 because it does not indicate what precise actions Defendant must take to verify and authenticate payment orders.

87. Moreover, the same section of the TMSMA (Section 6.1 of the General Terms and Conditions) goes on to say that "Security Procedures ***may*** involve a security code, password, personal identification number, user identification technology, certificate, or other means, or method of authentication, identification or verification (the 'Security Credentials')." (Emphasis added). The TMSMA (Section 6.2 of the General Terms and Conditions) says that "Client

NOT A CERTIFIED COPY

authorizes Bank to follow any and all instructions entered and transactions initiated using applicable Security Procedures." Again, because Defendant's Security Procedure does not clearly define what precise actions Defendant must take, and the precise information Defendant must verify (and how) to complete the authentication process, there was (and is) no agreed upon "applicable" Security Procedure between the parties as required by Florida Statutes Chapter 670.

88. Even if there was an agreed upon security procedure with respect to the authentication of the payment orders associated with the Fraudulent Wire Transfers, which RKPA denies, it was not commercially reasonable under Florida Statutes Chapter 670 for the following reasons, among others alleged in this complaint and to be determined through discovery and at trial:

i. The security procedure failed to describe the precise actions Defendant must take, and the precise information Defendant had to consider, to verify and authenticate the payment orders of RKPA;

ii. Defendant's security procedure revealed and provided the Threat Actor with Guy Rabideau's User ID to his online bank account from which the Fraudulent Wire Transfers were initiated by the Threat Actor;

iii. Defendant's security procedure lacked proper methods for verifying the identification of individuals accessing and/or requesting access to the RKPA Bank Account in Defendant's online banking platform from which payment orders are sent;

iv. Defendant's security procedure failed to identify the voice mismatch between the Threat Actor and Guy Rabideau;

v. Defendant's security procedure failed to identify the mismatch between the initiation of the Fraudulent Wire Transfers by the Threat Actor and RKPA's

NOT A CERTIFIED COPY

customary procedure of two separate RKPA users adding/creating a wire transfer with the second and different RKPA user authorizing that wire transfer;

vi. Defendant's security procedure failed to identify that RKPA had not and does not send wire transfers to certain geographic locations such as China and Mexico, which the Threat Actor did for some of the Fraudulent Wire Transfers; and

vii. Defendant's security procedure failed to detect or respond to the numerous Indicators of Fraud and other red flags that preceded and accompanied the Fraudulent Wire Transfers.

89. Even if Defendant's security procedure was commercially reasonable, which RKPA denies, Defendant nevertheless failed to act in good faith and in compliance with it in connection with the Fraudulent Wire Transfers by, among other things alleged in this complaint and to be determined through discovery and at trial:

i. Revealing and providing to the Threat Actor Guy Rabideau's User ID to his online bank account from which the Fraudulent Wire Transfers were initiated by the Threat Actor;

ii. Failing to properly verify the identification of individuals accessing and/or requesting access to the RKPA Bank Account in Defendant's online banking platform from which payment orders are sent;

iii. Failing to properly verify the caller before providing the Threat Actor with assistance and reissuing a new RSA token to the Threat Actor;

iv. Ignoring the voice mismatch between the Threat Actor and Guy Rabideau during the customer service call;

NOT A CERTIFIED COPY

v. Ignoring and/or acting with willful blindness to obvious and overwhelming Indicators of Fraud and other red flags that preceded and accompanied the Fraudulent Wire Transfers;

vi. Executing the Fraudulent Wire Transfers despite the Indicators of Fraud and other red flags known to Defendant without any verification or intervention;

vii. Executing certain Fraudulent Wire Transfers after having flagged the RKPA Bank Account for fraudulent activity;

viii. The security procedure failed to describe the precise actions Defendant must take, and the precise information Defendant had to consider, to verify and authenticate the payment orders of RKPA, meaning that Defendant cannot show compliance with a security procedure that is undefined; and

ix. Otherwise failing to follow its security procedure and other processes regarding customer identification in the manner required.

90. Because there was no agreed upon security procedure between Defendant and RKPA, and/or because Defendant's security procedure was not commercially reasonable, and/or because Defendant failed to act in good faith and in compliance with the security procedure, Defendant is not entitled to charge the RKPA Bank Account for the Fraudulent Wire Transfers, and Defendant was and is therefore obligated under Florida Statutes Chapter 670 to refund the full amount of the Fraudulent Wire Transfers to RKPA, together with interest from the date of payment.

91. Despite notice of the Fraudulent Wire Transfers provided to Defendant by RKPA and RKPA's demand for a refund, Defendant has refused and/or failed to refund the full amount of the Fraudulent Wire Transfers with interest, in further violation of its obligations under Florida Statutes Chapter 670.

NOT A CERTIFIED COPY

92. As a direct and proximate result of Defendant's violations of Florida Statutes Chapter 670, RKPA has suffered actual damages in an amount equal to the total of interest owed to RKPA on the Refunded Amount from the date the Fraudulent Wire Transfers were executed through and including the date upon which such funds were refunded to RKPA, plus the Outstanding Amount with interest from the date the Fraudulent Wire Transfers were executed through and including the date the Outstanding Amount is refunded to RKPA (thereby allowing RKPA to pay any and all interest that may be owed to Florida Legal Aid/The Florida Bar Foundation as a result of the Fraudulent Wire Transfers), as well all other losses and damages flowing therefrom.

**WHEREFORE**, RKPA demands judgment against Defendant for interest owed on the Refunded Amount together with the Outstanding Amount with interest, plus prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief as this Court deems just and proper.

NOT A CERTIFIED COPY

**COUNT II: Breach of Implied-in-Fact Contract**

93. RKPA realleges and incorporates paragraphs 1 through 77 above as if fully set forth herein.

94. The circumstances around Defendant taking over the RKPA Bank Account and RKPA's banking relationship from Iberiabank, together with the parties' conduct thereafter, is evidence they formed a contract governing the RKPA Bank Account and the sending of wire transfers.

95. RKPA's obligations under the contract, which it fully performed in all material respects, included maintaining the RKPA Bank Account in good standing and paying all applicable fees to Defendant.

96. Defendant's obligations under the contract included (among other things as alleged in this complaint and to be determined through discovery and at trial):

i. Implement, maintain, and follow commercially reasonable security procedures for authenticating the identity of persons requesting access to the RKPA Bank Account or requesting account changes;

ii. Properly authenticate the identity of individuals calling Defendant to request account modifications for, among other things, the issuance or reissuance of RSA tokens associated with the RKPA Bank Account before acting upon such requests;

iii. Execute wire transfers only upon properly verified and authorized payment orders from RKPA;

iv. Refrain from executing wire transfers that are not authorized by RKPA or that are preceded and accompanied by numerous red flags and Indicators of Fraud;

v. Monitor the RKPA Bank Account for fraudulent activity, including Indicators of Fraud, and take reasonable and appropriate action in the face of Indicators of Fraud and other red flags to protect the RKPA Bank Account;

vi. Securely protect and not reveal confidential customer information belonging to RKPA, including but not limited to User IDs associated with the RKPA Bank Account, its account balance, and other confidential information that would lead to fraudulent activity and/or bad actors targeting RKPA; and

NOT A CERTIFIED COPY

vii. Provide a secure online banking platform and implement proper security tools to protect the RKPA Bank Account from unauthorized access and unauthorized transactions.

97. Defendant materially breached the parties' contract by (among other things as alleged in this complaint and to be determined through discovery and at trial):

i. Providing the Threat Actor with Guy Rabideau's online banking User ID;

ii. Failing to properly authenticate the identity of the caller who called to request a new RSA token, thereby enabling the Threat Actor to obtain the credentials necessary to send the Fraudulent Wire Transfers;

iii. Failing to monitor and protect the RKPA Bank Account from fraudulent activity and failing to act upon numerous Indicators of Fraud and other red flags that preceded and accompanied the Fraudulent Wire Transfers;

iv. Executing the Fraudulent Wire Transfers that were not authorized by RKPA;

v. Failing to implement and follow commercially reasonable security procedures for the verification and authentication of wire transfers and account modification requests;

vi. Providing and/or disclosing RKPA's confidential customer information to the Threat Actor, the Florida attorney, and potentially others, and failing to notify RKPA that Defendant had done so; and

vii. Failing to provide a secure online banking platform and other security tools that would have protected the RKPA Bank Account from malicious attack and fraudulent activity; and

NOT A CERTIFIED COPY

viii. Otherwise failing to perform its obligations and exercise ordinary care to protect the funds in the RKPA Bank Account and deal fairly and properly with RKPA following the Fraudulent Wire Transfers, including by refusing to refund all amounts owed to RKPA with interest.

98. As a direct and proximate result of Defendant's material breaches of the parties' contract, RKPA has suffered actual and consequential damages in an amount to be proven at trial.

**WHEREFORE**, RKPA demands judgment against Defendant for compensatory damages, consequential damages, prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief as this Court deems just and proper.

**COUNT III: Breach of Contract**

99. RKPA realleges and incorporates paragraphs 1 through 77 above as if fully set forth herein.

100. In the alternative to the Breach of Implied-in-Fact Contract claim, and without admitting that the TMSMA and/or the Depositor Agreement are operative agreements between the parties, or that they would even be binding agreements showing mutual assent or consideration to each party, Defendant breached certain provisions in the TMSMA and Depositor Agreement.

101. More specifically, RKPA fulfilled its obligations under those agreements in all material respects, but Defendant's actions confirm that it failed to perform its obligations in the following ways (among others as alleged in this complaint and to be determined through discovery and at trial):

i. Defendant failed to keep "transaction, data and other information related to Services and any information provided by Client at the request of Bank . . . maintained as confidential and will not be disclosed by Bank to any other

NOT A CERTIFIED COPY

person or entity" (except for certain exceptions not applicable hereto) as required by Section 12 (General Terms and Conditions) of the TMSMA;

ii. Defendant failed to "maintain an information security program in compliance with federal law, which is designed to ensure the security, integrity and confidentiality of customer information, protect against any anticipated threats or hazards to the security or integrity of such information, and protect against unauthorized access to or use of such information" as required by Section 12 (General Terms and Conditions) of the TMSMA;

iii. Defendant failed to "comply with all applicable laws and its current data privacy policy with respect to information obtained pursuant to this Agreement or in the performance of the Services" as required by Section 12 (General Terms and Conditions) of the TMSMA;

iv. Defendant failed to "transmit Transfer Requests made in accordance with these Services Terms promptly and accurately" as required by Section 4.1 (Service Terms for Wire Transfer Service) of TMSMA;

v. Defendant failed to properly and fully enroll RKPA in its wire transfer service or have Security Administrators designated as required by the Services Authorization, Enrollment Form, and TMSMA Section 3.2 (Service Terms for Wire Transfer Service) of TMSMA;

vi. Defendant failed to protect the privacy of RKPA's information and "not disclose any information about [RKPA] or [its] account to any person, organization, or agency" (except for certain exceptions not applicable

NOT A CERTIFIED COPY

hereto) as required by the Confidentiality provision of the Depositor Agreement; and

vii. Defendant failed to provide notification within three (3) days after it discovered the unauthorized disclosures of RKPA's information as required by the Confidentiality provision of the Depositor Agreement.

NOT A CERTIFIED COPY

102. Defendant materially breached the provisions of these agreements by (among other things alleged in this complaint and to be determined through discovery and at trial):

i. Providing the Threat Actor with Guy Rabideau's online banking User ID;

ii. Failing to properly authenticate the identity of the caller who called to request a new RSA token, thereby enabling the Threat Actor to obtain the credentials necessary to send the Fraudulent Wire Transfers;

iii. Failing to monitor and protect the RKPA Bank Account from fraudulent activity and failing to act upon numerous Indicators of Fraud and other red flags that preceded and accompanied the Fraudulent Wire Transfers;

iv. Failing to properly and fully enroll RKPA in the wire transfer service with properly designated Security Administrators;

v. Executing the Fraudulent Wire Transfers that were not authorized by RKPA;

vi. Failing to implement and follow commercially reasonable security procedures for the verification and authentication of wire transfers, including the Fraudulent Wire Transfers, and account modification requests;

vii. Providing and/or disclosing RKPA's confidential customer information to the Threat Actor, the Florida attorney, and potentially others, and failing to timely notify RKPA that Defendant had done so;

viii. Not providing a secure online banking platform or implementing security tools in compliance with federal law, regulations, guidance, and its agreements and commitments to do so;

ix. Failing to provide a secure online banking platform or implementing security tools that would have protected the RKPA Bank Account from malicious attack and fraudulent activity, including but not limited to the Fraudulent Wire Transfers; and

x. Otherwise failing to exercise ordinary care in its performance of services and in the execution of its obligations to protect the funds in the RKPA Bank Account and deal fairly and properly with RKPA following the Fraudulent Wire Transfers, including by refusing to refund all amounts owed to RKPA with interest.

103. As a direct and proximate result of Defendant's material breaches of the parties' agreements, RKPA has suffered actual and consequential damages in an amount to be proven at trial.

**WHEREFORE**, RKPA demands judgment against Defendant for compensatory damages, consequential damages, prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief as this Court deems just and proper.

<u>**COUNT IV: Negligence**</u>

104. RKPA realleges and incorporates paragraphs 1 through 77 above as if fully set forth herein.

NOT A CERTIFIED COPY

105. As a financial institution maintaining and managing the RKPA Bank Account and overseeing execution of wire transfers from that account, Defendant owed RKPA a duty of reasonable care. Among other things, Defendant owed RKPA:

i. A duty to exercise reasonable care in authenticating the identity of any person calling to request account actions, especially high-security account actions including the reissuance of RSA tokens;

ii. A duty to implement, maintain, and follow commercially reasonable security procedures for authenticating payment orders and executing wire transfers to prevent the execution of unauthorized and fraudulent wire transfers;

iii. A duty to monitor the RKPA Bank Account activity for Indicators of Fraud and other red flags and take appropriate protective action upon detection of same;

iv. A duty to refrain from executing wire transfers bearing readily apparent Indicators of Fraud, red flags, and/or account compromise;

v. A duty not to reveal to third parties RKPA's confidential customer information, including its User IDs and other confidential information about its banking relationship with Defendant; and

vi. A duty to exercise reasonable care in training, supervising, and monitoring its customer service representatives and other employees who handle authentication requests, account modification requests, and who oversee and handle fraud monitoring and the execution of wire transfers.

106. Defendant breached its duty of reasonable care by, among other things:

NOT A CERTIFIED COPY

i. Providing the Threat Actor with Guy Rabideau's User ID;

ii. Providing and/or disclosing RKPA's confidential customer information to the Threat Actor, the Florida attorney, and potentially others;

iii. Failing to notify RKPA that it disclosed RKPA's confidential customer information to the Threat Actor, the Florida attorney, and potentially others;

iv. Failing to adequately authenticate the caller's identity before reissuing the RSA token to the Threat Actor;

v. Reissuing Guy Rabideau's RSA token without properly or sufficiently verifying the caller's identity through independent and reliable means;

vi. Failing to detect, flag, investigate, and/or act upon the numerous Indicators of Fraud and other red flags known to Defendant that preceded and accompanied the Fraudulent Wire Transfers;

vii. Failing to prevent, block, or otherwise not execute the Fraudulent Wire Transfers; and

viii. Otherwise failing to exercise the standard of care of a reasonable bank under the same or similar circumstances.

107. Defendant's failures were not the result of one erroneous or isolated incident, but instead indicative of systemic deficiencies in, among other things, its fraud monitoring, authentication, and wire transfer security protocols and procedures.

108. These systemic deficiencies were known, or should have been known, to Defendant and Defendant was obligated to address such deficiencies.

109. It was entirely foreseeable that Defendant's failure to, among other things, properly authenticate callers requesting account changes, including high-security account changes, detect

NOT A CERTIFIED COPY

and respond to Indicators of Fraud, and its failure to implement commercially reasonable security tools, would enable bad actors to execute fraudulent and unauthorized wire transfers causing financial harm to Defendant's customers including RKPA.

110. Fraud schemes, including but not limited to business email compromises, account takeovers, and social engineering tactics are well-documented and prevalent threats in the financial services industry. Defendant knew or should have known of these threats and the duty of care they impose on financial institutions to, among other things, verify authentication requests, monitor for anomalous account activity, implement robust fraud detection and know-your-customer protocols and procedures, and protect its customers from fraud such as fraudulent wire transfers.

111. As a direct and proximate result of the Defendant's negligent conduct, RKPA has suffered actual and consequential damages in an amount to be proven at trial.

**WHEREFORE**, RKPA demands judgment against Defendant for compensatory damages, consequential damages, prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief as this Court deems just and proper.

NOT A CERTIFIED COPY

**PRAYER FOR RELIEF**

**WHEREFORE**, RKPA demands judgment against the Defendant as follows:

A. Compensatory damages in an amount to be proven at trial, representing interest owed related to the Refunded Amount, together with the Outstanding Amount with interest from the date the Fraudulent Wire Transfers were executed until the Outstanding Amount is refunded to RKPA, plus all other losses sustained by RKPA as a result of Defendant's actions;

B. Consequential and incidental damages arising from Defendant's actions, including but not limited to the cost of engaging counsel for litigation and recovery of the Fraudulent Wire Transfers, the cost of engaging counsel to litigate this action and defend actions brought by third

parties whose funds were being held by RKPA in the RKPA Bank Account, the cost of engaging counsel to assist RKPA with its reporting obligations under the Rules Regulating the Florida Bar, disruption and interruption to RKPA's business, damage to RKPA's business and client relationships and to its reputation, and all other losses flowing from Defendant's execution of the Fraudulent Wire Transfers and its failure to refund all amounts owed to RKPA with interest following the Fraudulent Wire Transfers;

C. Refund of the full amount owed to RKPA pursuant to Florida Statutes Chapter 670 for Defendant's execution of the Fraudulent Wire Transfers, together with interest from their date of execution, as well as:

i. Prejudgment interest at the maximum rate permitted by applicable law;

ii. Post-judgment interest at the maximum rate permitted by applicable law;

iii. Costs of litigation and attorneys' fees incurred by RKPA as allowed under applicable law; and

iv. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

RKPA hereby demands a trial by jury on all issues so triable.

Dated: June 10, 2026

**HODGSON RUSS LLP**
440 Royal Palm Way, Suite 202
Palm Beach, Florida 33480
Telephone: (561) 656-8017
Facsimile: (716) 517-9888
Email: *ayanez@hodgsonruss.com*
*abard@hodgsonruss.com*
*courtmail@hodgsonruss.com*

By: */s/ Anthony R. Yanez*
ANTHONY R. YANEZ
Florida Bar No. 45219

NOT A CERTIFIED COPY

# EXHIBIT 1

NOT A CERTIFIED COPY

FIRST HORIZON

# TREASURY MANAGEMENT SERVICES AUTHORIZATION AND CONSENT

Client Name: RABIDEAU LAW P A
Address: 440 ROYAL PALM WAY STE 101
City: PALM BEACH State: FL Zip: 33480
Primary Contact: Guy Rabideau Phone: 561-386-5030 Email: grabideau@rabideau-law.com

This Treasury Management Services Authorization and Consent ("TM Authorization") is provided to First Horizon Bank ("Bank") by the above listed Client, including any subsidiaries or affiliates as may be identified on the Treasury Management Product Enrollment Form ("Enrollment Form"), with respect to the treasury management products and services offered by Bank (the "Services"). Client and any such subsidiaries or affiliates are collectively referred to as "Client."

Client may from time to time request Bank to provide any of the Services described in the Treasury Management Services Master Agreement (the "TM Service Agreement") by enrolling in any such Service through the Enrollment Form. Client may begin to use any such Service once Bank has approved such use and has received all required and properly executed forms and Client has successfully completed any implementation requirements.

Client hereby agrees to be bound by the TM Service Agreement, which provides General Terms and Conditions that apply to all Services as well as specific Service Terms and Conditions that apply to each Service for which Client has enrolled. The Enrollment Form, the TM Service Agreement and all amendments and addenda thereto, are incorporated herein and deemed part of this Master Agreement.

The undersigned hereby certifies and warrants that the undersigned has the full power and authority to execute this TM Authorization on behalf of Client and to enter into all Services provided under the TM Service Agreement.

NOT A CERTIFIED COPY

Customer Name: RABIDEAU LAW P A

Signature: DocuSigned by: Guy Rabideau E5DB7AD55B744ED...

Printed Name: Guy Rabideau

Title: Authorized signer

Date: 4/18/2023

[redacted]

# EXHIBIT 2

NOT A CERTIFIED COPY

FIRST HORIZON

# Treasury Management Product Enrollment Form

## Client Information:

| | | |
|---|---|---|
| Client Name (Parent Company): RABIDEAU LAW P A | | |
| Address: 440 ROYAL PALM WAY STE 101 | | |
| City: PALM BEACH | State: FL | Zip: 33480 |

## Select Applicable Services:

NOT A CERTIFIED COPY

| INFORMATION REPORTING/SWEEPS | | | | | | | |
|---|---|---|---|---|---|---|---|
| TreasuryConnect | Controlled Disbursement | Electronic Payment Reports | Business Investment Account | Loan Sweep | Liquidity Sweep | ZBA | Statewide Deposit |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| BAI File Transmission | | | | | | | |
| ☐ | | | | | | | |
| **RECEIVABLES** | | | | | | | |
| Remote Deposit | Mobile RDC | Image Cash Letter | Wire Transfer | ACH | ACH Tokenization | Electronic Payment Reporting | Cash Vault |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Lockbox | | | | Electronic Lockbox | Electronic Bill Pay | International Wire | |
| Retail | Wholesale | Low Volume | Remote Lockbox | | | | |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| **PAYABLES** | | | | | | | |
| Account Reconciliation | Check Print | Integrated Payables | Invoice to Pay | ClearPath Fast Payments | Business Bill Pay | Image Delivery Services | |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| **FRAUD PROTECTION** | | | | | | | |
| Positive Pay | Reverse Positive Pay | ACH Positive Pay | | | | | |
| ☒ | ☐ | ☐ | | | | | |

## Security Administrators:

| | | | | |
|---|---|---|---|---|
| Select Applicable Products: ☐ TreasuryConnect ☐ Remote Deposit Capture ☐ Lockbox | | | | |
| ☐**Add** | Name: | | Email: | |
| | Phone Number: | | | |
| Select Applicable Products: ☐ TreasuryConnect ☐ Remote Deposit Capture ☐ Lockbox | | | | |
| ☐**Add** | Name: | | Email: | |
| | Phone Number: | | | |
| Select Applicable Products: ☐ TreasuryConnect ☐ Remote Deposit Capture ☐ Lockbox | | | | |
| ☐**Add** | Name: | | Email: | |
| | Phone Number: | | | |

## Subsidiaries and/or Affiliates

If additional subsidiaries or affiliates of Client are subject to the Treasury Management Master Agreement, complete the following:

| Full legal name of entity | Relationship to Client (please check) | | | Tax Identification Number (TIN): |
|---|---|---|---|---|
| | Subsidiary | Affiliate | Client's % ownership | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## INDIVIDUALS AUTHORIZED TO ACT ON BEHALF OF CLIENT

In addition to the individuals designated as an authorized signer on Client's account, listed below are the names of individuals authorized to act on behalf of the Client on all matters relating to the Services for any of the legal entities bound by this agreement unless restricted authority is noted below. Each individual is authorized to designate authorized representatives from time to time. Bank may rely on the authorities designated herein until notified otherwise in writing.

| Name of Authorized Signer | Restricted Authority | | Define Restricted Authority by Tax ID |
|---|---|---|---|
| | Yes ☐ | No ☐ | |
| | Yes ☐ | No ☐ | |
| | Yes ☐ | No ☐ | |
| | Yes ☐ | No ☐ | |
| | | | |

NOT A CERTIFIED COPY

**DUAL APPROVAL OPT OUT**

Despite the recommendation of Bank, Client wishes to have only one authorized user for approval of online ACH and/or wire entitlements or transactions. Client has indicated by marking the appropriate box below whether single person approvals are applicable to entitlements or transactions for ACH, wire or both. Client believes and agrees that, in the context of its operations, requirements and internal procedures, the single authorized user approval procedure ("Alternative Security Procedure") is commercially reasonable. Client recognizes that having only one user for entitlements or transactions may increase the risk of loss and, accordingly, releases Bank from any responsibility or liability for same. In addition, Client agrees to be bound by any payment order or instruction in accordance with the Alternative Security Procedure.

| | | | |
|---|---|---|---|
| ☒ User Management | ☒ Transactions - ACH | ☒ Transactions - Wire | ☐ Invoice to Pay |

This Treasury Management Product Enrollment Form ("Enrollment Form") details the Treasury Management services to be provided by Bank and is required to be updated as changes to these services are requested. This Enrollment Form will remain in force until (i) First Horizon Bank receives a new Enrollment Form, or (ii) First Horizon Bank receives notice of revocation of any election made herein and it has had a reasonable time to verify and act on the change(s). Any notice of revocation may impact the availability of any or all of the services being provided.

Signature below must be executed by a person listed on a Certified Resolution of the Company's Board of Directors or a comparable document on file, which designates such person as authorized to negotiate bank services on behalf of all the legal entities bound by this agreement.

Signature: DocuSigned by: Guy Rabideau E5DB7AD55B744FD...

Printed Name: Guy Rabideau

Title: Authorized Signer

Date: 4/18/2023

[redacted]

NOT A CERTIFIED COPY